SHORES, Justice.
Walter C. Jones and George H. Skipper recorded a subdivision plat of Wildwood Estates in Baldwin County in the early part of 1973. Planning of the subdivision had begun in 1971. The plat was not offered for approval by the County Commission because approval of subdivisions was not required at that time. Baldwin County is one of some ten counties in the state described as captive counties which have limited authority over roads within the county. Act No. 142 of the 1951 Legislature relates to Baldwin County and provides in Section 1 that the State Highway Department shall, subject to the provisions and limitations contained in the act, be responsible for construction, maintenance and repair of existing roads in the county; Section 2 states that the authority of the Baldwin County Commission shall be to levy tax, borrow money, eminent domain and determine what roads will be built, subject to the approval of the Highway Department; Section 3 states that Baldwin County shall have no authority (a) to control personnel for maintenance or repair of roads, (b) to purchase equipment for maintenance or repair of roads, and (c) to pay any person for services rendered in the maintenance or repair of roads; Section 6 provides that Baldwin County “. . . shall continue to have under its present road laws the right, power, duty, authority and jurisdiction to establish new county roads and bridges . and the State at its election may take over the same for construction and maintenance . . . ”
Because of this Act, the county has the authority to “establish” new county roads and the State, at its election, may assume maintenance of the same.
The testimony in this case indicates that the developers conferred with an engineer for the State before they laid out the subdivision. He told them what the State requirements were, which were set out in Regulations of the Highway Department, insofar as width of roadbed, depth of ditches, and drainage pipes were concerned. The developers testified that the roads were constructed to conform to State requirements. Another State engineer inspected the roads upon completion and advised his superior by letter on September 4, 1973, that all State requirements appeared to have been met. This letter said: “The Commission asked that we look at the streets to see if there is a possibility of maintaining them, and give them a report so they may make a decision on this matter.”
On September 4, 1973, the same day this letter was written, the developers applied to the County Commission for acceptance of the roads. The minutes of the meeting of the County Commission held on October 2, 1973, are as follows:
“‘Motion by Commissioner McMillan, seconded by Commissioner Still, that the Commission not accept the Wildwood Es *1202 tate Subdivision for the Maintenance Program as the roads to [sic] meet State Highway specifications but the Subdivision is not populated enough to take over for maintenance. Voting yea: Bishop, Still and McMillan — Nay: Hankins. . . .’”
These minutes indicate that a majority of the commissioners voted not to accept the roads for maintenance because the subdivision was not yet populated enough, although the roads at that time did meet State Highway Department specifications.
Shortly thereafter, the State began to “flat blade” the roads from time to time. It was the testimony of witnesses for the State that these roads had never been put on the regular maintenance program, that the county had never accepted them for maintenance; the State had, however, as a courtesy to the people living on these roads, scraped them every three or four months, but that such scraping with a flat blade is not a regular maintenance program. The State continued to do this from late 1973 until early 1976.
One of the residents of the area testified that the roads were beautiful roads and the ditches “good” when she bought her property in early 1974, but the State’s scraping them had just “ruined the roads — just flattened them.”
The minutes of the County Commission meetings and the record of the proceedings before us reflect that residents of the subdivision complained to the Governor, the Highway Department and the County Commission about the condition of these roads beginning as early as 1974. The minutes of the County Commission meetings show the following:
Meeting of January 6, 1976:
“ ‘Lonnie Walker and delegation appeared before the Commission to request the roads in the Wildwood Estates, South of Loxley, be accepted and maintained by the County Road Department. After a lengthy discussion and determining that twenty-one families were living in the subdivision and that the roads had not been accepted in 1973 due to the low occupan[c]y, the Commission suggested to Mr. Walker that a meeting be established with Jones & Skipper, the State Highway Department and the County Commission as soon as possible in order that Jones & Skipper may reapply to the County for the possible acceptance of the road in question, Mr. Walker also presented a petition from approximately fifty people requesting the same.’ ”
Meeting of February 17, 1976:
“ ‘George Skipper and Jones appeared before the Commission to request acceptance of the Wildwood Subdivision for maintenance. A letter was read from the State Highway Department giving their report on a recent investigation and the deficiencies that the subdivision has according to the April 15, 1975 Subdivision regulations.[1] . . . ’ ”
The record shows that the Commission asked the Highway Department to investigate the matter and report on any deficiencies in the roads based upon subdivision regulations adopted after the first request for acceptance of the roads had been disapproved. The Highway Department reported a number of discrepancies on February 2, 1976, and stated that no further action would be taken by the Department until a formal letter from the Commission was received stating that the conditions of noncompliance had been waived by the Commission or that the deficiencies would be corrected. That letter indicated that the Highway Department would accept the maintenance of the roads if the Commission waived the conditions not in compliance with the then existing subdivision regulations.
On April 5, 1976, Mr. Risher, Division Maintenance Engineer, Highway Department, addressed a letter to Engineer. Bureau of Maintenance, Highway Department, in which he said:
*1203 “Several years ago, the developers, George Skipper and W. C. Jones, made a request to the Baldwin County Commission that the subdivision be accepted for maintenance. This request was rejected by the Commission because of very little or no occupancy. As a matter of courtesy to the people living on this road, we have tried to keep the road passable by an occasional blading.
“On Thursday, April 1, I met with Mr. Skipper and Mr. Jones, the developers, along with several members of the Baldwin County Commission and reiterated our position that the subdivision would have to be improved to meet our minimum subdivision standards before it could be accepted for maintenance. The subdividers agreed to grade, drain and base the project if the Baldwin County Commission would furnish the required wide drain pipe. The Commissioners agreed to bring this up for consideration at their next meeting on Tuesday, April 6. . .
On April 6, 1976, the developers wrote to the Commission and stated their position:
They had conferred with the Highway Department’s resident engineer prior to building the roads; they were built according to the then existing regulations and were so certified by the Highway Department’s engineer upon completion. The developers asserted that the roads were dedicated to Baldwin County in March 1973 (when the plat was recorded); they applied for acceptance of the roads in September, but the Commission did not officially accept them at that time, but only because the subdivision was not yet sufficiently populated and not because the roads were not in compliance with State standards; the State, at the request of the Commission, did commence to grade the roads as needed; and there are twenty-five families living in the subdivision, but as a result of heavy traffic and the “leveling” type grading done by the State for the past two years, the roads are in “terrible” shape.
The developers agreed at a meeting held on April 1, at which 2 commissioners and 2 representatives of the Highway Department were present, to furnish the dirt, pull the ditches, base the roads and cover the culverts. The county would furnish the culverts, if the other commissioners would agree, and the Highway Department agreed to lay the culverts to grade.
This letter ended:
“. . .In order to permanently end the problem, we have stated what we will do. Our offer as above, concerning pulling ditches, basing, and covering culverts, will remain good until 12:00 Noon today, Tuesday, April 6, 1976
Minutes of the April 6, 1976, meeting contain the following:
“ ‘The Commission discussed the proposal by Mr. Jones & Mr. Skipper concerning the Wildwood Subdivision. Motion by Bishop, seconded by McMillan, to authorize the Chairman to write the State Highway Department stating that an agreement has been made between the developers of Wildwood Estates and the County Commission and ask that the State Highway Department go along with the agreement for Skipper & Jones to pull the ditches in said subdivision, to base the roads and to cover the metal driveway pipes, and the property owners in the subdivision furnish the necessary metal culverts. The Commission at this time shall accept or recommend acceptance of the roads for maintenance. Variances shall be waivered [sic] in respect to width of right-of-way, five miles radius of Loxley, and that the road be paved. Voting yea: Bishop, McMillan and Lauder — Nay: Hankins. Hankins stated his objection to the motion was that the majority of the people in the subdivision are already on the pipe list and he feels the County is obligated to furnish the necessary driveway culverts at no expense. The Chairman asked the Attorney if the subdivision has not been accepted for maintenance was it legal for the County to furnish the pipe that had been requested by the property owners — in the opinion of the County Attorney it was not legal.’ ”
*1204 Thereafter, on April 19, 1976, the developers and one of the residents of the subdivision filed a petition for writ of mandamus against the Baldwin County Commissioners and the Highway Director of the State of Alabama setting out, in substance, the above facts and asking the circuit court to direct the respondents to maintain the roads. After a hearing, the trial court entered an order which included a finding that engineers employed by the State Highway Department maintained the roads or streets from September 1973 until about September 1975 and that . . Respondents are estopped from denying acceptance of the roads in the subdivision known as Wildwood Estates . . . ” The court then ordered all respondents to “. . . forthwith be responsible for the maintenance and repair of the existing public county roads shown on the map or plat of Wildwood Estates . . .”
The respondents appeal from this order.
The facts in this case are not disputed. The issues are legal ones, i. e., whether the County Commission has accepted these roads as public roads by act or deed and, if not, is the Highway Department now es-topped to deny that it has an obligation to maintain them as public roads, because it undertook to grade them for a two-year period.
The County Commission in this case did not approve the subdivision plat before it was recorded . Approval was not required at that time. Even had it done so, however, such approval does not amount to an acceptance of the roads as public roads. Tuxedo Homes, Inc. v. Green, 258 Ala. 494, 63 So.2d 812 (1953). When the County Commission was requested by the developers to accept the roads, it refused. The minutes of the meetings show the county persisted in refusing to accept these roads up until its April 6,1976, meeting, at which time they were conditionally accepted.
The developers and residents of this subdivision concede that the county never expressly accepted these roads as public roads, but assert that the action of the Commission in asking the Highway Department to grade the roads, and the Highway Department having undertaken to do so, amount to an estoppel to deny that the roads have been accepted as public roads, requiring the Highway Department to maintain them as such. The facts as supplied by the petitioners themselves defeat this argument. It was their evidence that the Highway Department graded these roads some fifteen or twenty times or more over a two-year period. It was this grading which they claimed ruined the roads. All during the period in which the State was doing the grading, the residents and Developers continued to try to get the roads accepted as public roads. They obviously did not look upon the grading by the State as maintenance of the roads, but, to the contrary, continued to press for maintenance; but the roads were never, at any time, put on the maintenance program. The petitioners were aware of this. Under the undisputed facts, we cannot agree with the trial court in its conclusion that the respondents are estopped to deny that these roads have been accepted for maintenance. An equitable estoppel is to be determined upon the facts of each particular case. Madison County v. Williams, 236 Ala. 470, 183 So. 452 (1938).
This record discloses that the County Commission refused to accept these roads as public roads to be maintained as such until its meeting of April 6, 1976. At that time, it agreed to accept them upon the conditions set out in those minutes. The evidence fails to support the theory of estoppel relied on by the petitioners. Until the conditions of acceptance are met as set out by the County Commission at its meeting of April 6, mandamus will not lie to compel the appellants here to maintain the roads involved in this litigation.
The judgment of the trial court is therefore, reversed and remanded.
REVERSED AND REMANDED.
TORBERT, C. J., and MADDOX, FAULKNER and BEATTY, JJ., concur.

. Baldwin County Commission adopted Subdivision Regulations on that date pursuant to Act No. 1094, enacted by the Legislature on September 17, 1973, after the Wildwood Subdivision plat was recorded.